United States District Court
Southern District of Texas

**ENTERED**

December 12, 2022

Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JASON BRIAN HAMLIN,                    §
                                       §
            *Petitioner*,              §
                                       §        Civil Action No. H-22-1882
v.                                     §
                                       §
BOBBY LUMPKIN,                         §
                                       §
            *Respondent*.              §

## MEMORANDUM OPINION AND ORDER

Petitioner, a state inmate proceeding *pro se*, filed this habeas lawsuit under 28 U.S.C. § 2254 challenging his conviction for stalking–harassment. Respondent filed a motion for summary judgment, and served petitioner a copy of the motion on September 30, 2022. (Docket Entry No. 8.) Despite expiration of a reasonable period of time in excess of sixty days, petitioner has not responded to the motion for summary judgment and the motion is unopposed.

Having considered the motion for summary judgment, the pleadings, the record, and the applicable law, the Court **GRANTS** the motion for summary judgment and **DISMISSES** this lawsuit for the reasons shown below.

### I.  BACKGROUND AND CLAIMS

A jury found petitioner guilty of felony stalking – harassment in Montgomery County, Texas, on April 4, 2019, and sentenced him to life imprisonment (enhanced). The conviction

was affirmed on direct appeal, and the Texas Court of Criminal Appeals refused discretionary review on January 27, 2021. *Hamlin v. State*, No. 09-19-00104-CR, slip op. (Tex. App.—Beaumont 2020, pet. ref'd.).

Petitioner's application for state habeas relief, filed with the state trial court on September 13, 2021, was denied by the Texas Court of Criminal Appeals on April 6, 2022, without a written order on the findings of the trial court without a hearing and on the court's independent review of the record. *Ex parte Jason Brian Hamlin*, No. 93,627-01 (Tex. Crim. App. 2022).

Petitioner filed the instant federal habeas petition on June 1, 2022, raising the following grounds for relief:

1.      Trial counsel was ineffective in failing to

   a.      respond to the State's motion in limine regarding complainant's conviction and a protective order;

   b.      reply to the State's trial brief regarding the admissibility of a prior relationship between petitioner and complainant;

   c.      investigate, discover, and present mitigating evidence;

   d.      present an expert or rebuttal witness to the State's domestic violence expert; and

   e.      challenge the Stalking Statute as violating petitioner's First and Fourteenth Amendment rights.

2.      Petitioner was denied his confrontation rights because complainant did not appear or testify at trial.

2

3.      Petitioner was denied his confrontation rights because "there was no subjective evidence from [complainant]."

Respondent argues that these grounds have no merit and should be summarily dismissed.

## II.  FACTUAL BACKGROUND

A.      Statement of Facts

The intermediate state court of appeals set forth the following statement of facts in its opinion affirming petitioner's conviction:

> On October 16, 2017, Deputy Steve Cranston of the Montgomery County Sheriff's Office responded to a 911 call regarding a possible trespass in progress at a residence in The Woodlands.  When Cranston arrived at the residence, the victim, N.H., was in the entryway of her home, and Cranston explained that she was "pretty hysterical[,]" "agitated[,]" and "fearful[.]" According to Cranston, Hamlin "seemed willing to get in his truck and leave." Cranston explained that a trespass warning was issued to Hamlin. A recording of N.H.'s 911 call was admitted into evidence and published to the jury. According to Cranston, a male voice could be heard shouting in the background of the 911 call, and he could also hear someone knocking on a door.  Cranston testified that he believed N.H. might have taken drugs or been drinking, but she was articulate, and he could understand what had happened. Cranston explained that he had no doubt that N.H. did not want Hamlin at the residence.
>
> Zach Maglisceau, a former night auditor at the Beachcomber Inn in Galveston, testified that an incident involving Hamlin and N.H. occurred at the Beachcomber Inn at approximately 2:00 a.m. on December 27, 2017. Maglisceau explained that N.H. ran up to the window in the lobby, pounded on it, and screamed, "Help me, call the police." According to Maglisceau, N.H. was only wearing a shirt and socks, and she seemed scared and had been crying. After Maglisceau let N.H. inside, N.H. was panicking, and she wanted Maglisceau to make sure the door was locked, and N.H. did not want to be visible from the window. Maglisceau testified that N.H. told him she had been

held against her will, but she escaped and was afraid that Hamlin would come after her. Maglisceau explained that he allowed N.H. to sit behind the counter and behind a door, and he called the police. Maglisceau described N.H. as "scared and panicky."

When the police arrived, they interviewed N.H. and Maglisceau, but they were unable to locate Hamlin. Maglisceau testified that he eventually put N.H. in a different room. According to Maglisceau, he received several calls throughout the night from a man who identified himself as Hamlin, and the caller said "if some girl showed up[,] she was a liar and not to believe . . . anything she said." Maglisceau testified that the caller threatened him and the hotel. Maglisceau transferred a call to N.H.'s room that turned out to be from Hamlin, and Maglisceau testified that N.H. called back "in a panic[,]" left the new room, and returned to the lobby, where she remained for the rest of the night. Maglisceau explained that he called the police again. According to Maglisceau, Hamlin made more than five threatening phone calls to the hotel, and Hamlin called fifteen to twenty times asking for N.H.

Steve Jensen, the manager and part owner of the Beachcomber Inn, testified that he saw N.H. asleep on two chairs when he arrived. Maglisceau informed him that N.H. had nowhere to go and no money, so Jensen decided to get a taxi to take N.H. to her home in The Woodlands. According to Maglisceau, by the time he spoke to investigators, the surveillance video recording of the incident was no longer available.

N.H.'s mother, J.H., testified that N.H. lives with her. J.H. explained that N.H. had been diagnosed as bipolar. According to J.H., N.H. began dating Hamlin in the fall of 2017. J.H. explained that in October 2017, N.H. called 911 to come to the residence, and when J.H. got home from work, N.H. was agitated, edgy, emotional, and fearful. N.H. told J.H. that she had hidden in a cupboard in the bathroom because N.H. thought Hamlin had broken into the house. According to J.H., around Christmas 2017, she learned that N.H. and Hamlin were going to Galveston. When N.H. returned on New Year's Eve, J.H. testified that N.H. had spoken to a women's shelter and was agitated, frantic, and "very frightened." J.H. testified that N.H. subsequently rang the doorbell and pounded on the door at 4:30 a.m., and when J.H. opened the door, N.H. was frantic, and N.H. told her that she had just jumped out of Hamlin's car. J.H. described N.H. as "pretty incoherent, frightened, crying, [and] banged up." J.H. explained that N.H. called 911.

According to J.H., after that incident, "nonstop" phone calls began coming to her residence, and the calls continued for many days, until J.H. turned off the answering machine and the ringers on the phones, and eventually took the phone off the hook. J.H. stated that Hamlin was the caller. According to J.H., Hamlin left "a lot of voicemails[,]" which J.H. characterized as "very disturbing[.]" J.H. testified that sometimes Hamlin called every two minutes. J.H. testified that when the calls were coming in, N.H. appeared to be very frightened and tormented, and she would not come out of her room. According to J.H., N.H. appeared to be harassed, annoyed, tormented, and alarmed by the calls. J.H. explained that N.H. had talked about going to a women's shelter because she did not feel safe at home. J.H. testified that Hamlin "threatened to burn the house down." Recordings of the voicemail messages Hamlin left were admitted into evidence and published to the jury. J.H. explained that N.H. had used drugs before and during her relationship with Hamlin, and J.H. testified that she does not know where N.H. is.

Deputy Jacob Rodgers of the Montgomery County Sheriff's Office testified that he investigated the stalking allegation against Hamlin. Rodgers explained that the first event that he investigated was "a report of a family violence incident which took place at the victim's residence on October 8th of 2017." According to Rodgers, Hamlin was the suspect, and Hamlin had fled the scene when Rodgers arrived. Rodgers explained that N.H. was scared, shaken, and rattled, and she "expressed a lot of fear and anxiety whenever she spoke about [Hamlin]." Rodgers testified that because N.H. appeared to be rattled and fearful, he believed that "a physical disturbance had occurred that had not amounted to bodily injury[,]" so he continued to investigate until he found Hamlin at his residence. Hamlin admitted that a verbal disturbance had occurred, but he denied touching or assaulting N.H.

Rodgers testified that the next incident he investigated was a dispatch call regarding a criminal trespass or attempted burglary at the same residence on October 16, 2017. Rodgers explained that he, Deputy Cranston, and others responded to the 911 call. While investigating the second incident, Rodgers discovered that between 12:00 a.m. and 4:32 p.m. (when the victim called 911), 357 calls were made from Hamlin's phone to N.H.'s phone. The third incident Rodgers investigated was at the Beachcomber Inn in Galveston. Rodgers explained that he reviewed the investigating officers' records from the incident at the hotel and spoke with Maglisceau. In addition, Rodgers investigated an account of "family violence assault or vehicle disturbance[]"

on January 21, 2018, about a mile from the victim's residence.  According to Rodgers, Hamlin called the victim's phone 196 times on January 22, 2018; 145 times on January 24, 2018; and 235 times on January 25, 2018.  Rodgers testified that his investigation confirmed his belief in the account N.H. provided.  In addition, Rodgers reviewed voicemail messages left on the phone at the victim's residence, which were offered into evidence and published to the jury.  Rodgers further testified that he investigated an alleged assault of the victim by Hamlin that occurred in the parking lot of Lowe's, and he took Hamlin into custody and interviewed him.  Rodgers also explained that while Hamlin was in custody, he attempted "to solicit the assistance of his family members to . . . bother the victim[.]"

Hugo Saldana, the manager of Lowe's in Spring, Texas, explained that he saw a male and female in the parking lot, and he knew "something wasn't right."  According to Saldana, the male jumped out, started holding the female tightly, and they began walking toward the front of the store.  Saldana explained that he contacted the store's loss prevention manager, Jay Davila.  Davila testified that Saldana notified him that "there was a couple involved in an aggressive argument in the parking lot."  Saldana later saw the female walking slowly through the store, and he testified that she had "a petrified look[,]" watery eyes, and she seemed "very, very frightened."  Saldana explained that he approached her and asked if she needed help, and she told him that her boyfriend had threatened her with a knife.  Saldana testified that the victim was crying, shaking, and "very distressed."

Harris County Deputy Constable Victor Taylor testified that he investigated a weapons disturbance involving Hamlin on January 26, 2018, in the parking lot of Lowe's.  According to Taylor, N.H. looked emotional and scared, and she was crying.  Taylor reviewed the video footage from Lowe's, which showed N.H., who was the passenger in Hamlin's vehicle, get out of Hamlin's vehicle and start walking toward the store's main entrance.  Taylor explained that the video showed Hamlin's truck following N.H. as she walked toward the store, and then Hamlin parked his vehicle, got out, walked behind N.H., wrapped his arm around her, and started walking "in an aggressive manner."

*Hamlin v. State*, No. 09-19-00104-CR, slip op. at 1–7.

B.    Trial Counsel's Affidavit

In compliance with the state trial court's order on collateral review, trial counsel submitted an affidavit wherein he testified as follows;

> My name is Jerald D. Crow.  I am (80) eighty years old.  My office address is 414 W. Phillips St., Suite 101, Conroe, Texas 77301.  I was licensed to practice law in Texas on May 12, 1966 and am currently in good standing with the Texas Bar Association.
>
> On March 9, 2018, I was appointed by Montgomery County 9th District Court to represent Defendant Hamlin in a felony stalking case.
>
> SIGNIFICANT TRIAL EVENTS
>
> 1.    During the testimony of the State's first witness, Mr. Hamlin repeatedly and in a loud voice, contradicted the testimony of the State's first witness in the presence of the jury.  Mr. Hamlin told the Judge that "he was not going to sit through the trial and listen to all the evidence and that he would continue to disrupt the proceedings if required to do so."
>
> Mr. Hamlin was cautioned by the court to cease and desist interrupting the witness testimony numerous times.  Finally, Mr. Hamlin was removed from the courtroom and returned to the jail where he spent the remainder of his trial.
>
> 2.    Shortly before the State rested its case, the prosecutor advised the Court and defense that it was going to rest its case without calling the victim as a witness because she could not be located.
>
> Issues To Be Addressed
>
> 1.    Please explain why you did not introduce evidence related to the victim's Criminal Mischief conviction or the protective order between the victim and her mother?
>
> Reply:    The victim did not appear for trial and did not testify. Consequently such evidence was not admissible nor relevant as impeachment.

2.      Please explain why you did not oppose or otherwise respond to the State's trial brief related to the admissibility of the applicant and victim's relationship?

Reply:  Trial briefs to a court are not evidence in a criminal trial and do not require a response. The best evidence of the relationship between Petitioner and the victim was the testimony of both Petitioner and the victim. Both Petitioner and victim were voluntarily absent during the trial.

3.      Did you employ any investigative efforts regarding the circumstances of this case and/or any potential mitigation evidence that could have been presented during the applicant's trial?  Please explain.

Reply: Prior to trial, the State, through the Montgomery County District Attorney's office Portal, disclosed all the evidence intended to be used in prosecuting Petitioner. On September 20, 2020, the State provided to Defense Counsel its response to the Standard Discovery Order previously entered by the Court.  At counsel's request, an investigator was appointed on April 16, 2018, to assist the defense in preparing for trial.

Having concern for Petitioner's mental health, Counsel also filed a motion for appointment of a mental health expert on April 17, 2018, which was granted by the Court. The expert report was provided to counsel, the State and the Court.

4.      Did you discuss possible defensive theories with the applicant? Please explain. Did you consider subpoenaing the victim or any other witnesses for the applicant's trial. Why or why not?

Reply:  Yes and No. The issue in a stalking case is the victim's fear of bodily injury or death resulting from stalking events.  Consequently, the perception or fear of bodily injury or death in the mind of the victim is of primary importance in a stalking case and must be proved beyond a reasonable doubt.  I did not consider subpoenaing the victim since this element was the primary element of proving the case by the State.  Subpoenaing the victim to shore up the State's case would have been a violation of my duty to my client.

5.      Did you consider hiring an expert to address the testimony of the State's domestic violence expert?  Please explain. If so, why was such expert testimony not presented in the applicant's defense?

Reply:  No.  No evidence was revealed during the investigation of, nor preparation of, the case for trial, nor witness testimony that the victim possessed the requisite mental fear of death nor serious bodily injury required under a felony stalking statute charge.  Thereafter the State rested its case. Defense Counsel moved for an instructed verdict of "Not Guilty" which was denied by the Court.

(Docket Entry No. 9-28, pp. 23–26.)

C.    Trial Court's Findings of Fact and Conclusions of Law

In recommending that habeas relief be denied, the state trial court made the following

relevant findings of fact and conclusions of law:

FINDINGS OF FACT

1.      The applicant was charged by indictment with the third-degree felony offense of stalking. The indictment also alleged, for punishment enhancement purposes, that the applicant previously had been convicted of three felony offenses. The applicant pleaded not guilty.

2.      A jury found the applicant guilty as charged, found the enhancement paragraphs true, and assessed the applicant's punishment at imprisonment for life.

*      *      *      *

6.      The Court is familiar with the performance of the applicant's trial attorney, Jerald Crow, who has long practiced in the courts of Montgomery County and is well qualified for appointment as trial counsel in criminal cases.

7.      Crow has submitted a credible affidavit in answer to the applicant's claims of deficient performance.

9

8. Crow's decision to not object to the State's motion in limine or attempt to introduce evidence related to the grounds in the State's motion was not unreasonable as that evidence was inadmissible.

9. Evidence related to the applicant's prior bad acts was admissible at trial to establish the facts and circumstances surrounding the relationship between the applicant and the victim.

10. Crow did solicit and subsequently utilize the findings of a court-appointed investigator and a court-appointed mental health expert.

11. Evidence of the applicant's affair with [a third party] was introduced at trial.

12. The applicant fails to allege which expert witness was available for trial or support his contention that this expert testimony would have benefitted his case.

13. The victim did not testify at trial.

CONCLUSIONS OF LAW

1. There remain no previously unresolved issues of fact material to the legality of the applicant's conviction and sentence, and an evidentiary hearing is not required.

2. Each of the applicant's grounds allege non-cognizable claims or fail to allege facts which, if true, might warrant relief.

3. "[I]n general, a facial constitutional challenge to a statute does not implicate an absolute requirement or prohibition that is exempt from ordinary preservation-of-error requirements, and, therefore, such a challenge may not be presented for the first time on direct appeal."

4. The applicant has failed to establish that his trial counsel was deficient or that any deficiency of counsel affected the outcome of the applicant's case.

5.   The non-appearance of the victim at trial did not violate the applicant's right to confrontation.

6.   Section 42.07(a)(4) of the Texas Penal Code (the "Stalking Statute") is neither vague, nor overbroad.

7.   "[A] claim which was previously raised and rejected on direct appeal is not cognizable on habeas corpus."

8.   An argument that could have been raised at trial is not cognizable on habeas corpus.

(Docket Entry No. 9-29, pp. 85–89, citations omitted.)  In denying state habeas relief, the Texas Court of Criminal Appeals relied on these findings. *Ex parte Jason Brian Hamlin*, No. 93,627-01 (Tex. Crim. App. 2022), at cover.

## III.  LEGAL STANDARDS

A.   <u>Habeas Review</u>

This petition is governed by provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  Under the AEDPA, federal habeas relief cannot be granted on legal issues adjudicated on the merits in state court unless the state adjudication was contrary to clearly established federal law as determined by the Supreme Court, or involved an unreasonable application of clearly established federal law as determined by the Supreme Court. *Harrington v. Richter*, 562 U.S. 86, 98–99 (2011); *Williams v. Taylor*, 529 U.S. 362, 404–05 (2000); 28 U.S.C. §§ 2254(d)(1), (2).  A state court decision is contrary to federal precedent if it applies a rule that contradicts the governing law set forth by the Supreme Court, or if it confronts a set of facts that are materially indistinguishable from such a

decision and arrives at a result different from the Supreme Court's precedent. *Early v. Packer*, 537 U.S. 3, 7–8 (2002).

However, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Richter*, 562 U.S. at 102. As stated by the Supreme Court in *Richter*,

> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal.

*Id.*, at 102–103 (emphasis added; internal citations omitted).

The AEDPA affords deference to a state court's resolution of factual issues. Under 28 U.S.C. § 2254(d)(2), a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless it is objectively unreasonable in light of the evidence presented in the state court proceeding. *Miller–El v. Cockrell*, 537 U.S. 322, 343 (2003). A federal habeas court must presume the underlying factual determination of the state court to be correct, unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Miller–El*, 537 U.S. at 330–31. This presumption of correctness extends not only to express factual findings, but also to implicit or unarticulated findings which are necessary

12

to the state court's conclusions of mixed law and fact. *Murphy v. Davis*, 901 F.3d 578, 597 (5th Cir. 2018).

      B.     Summary Judgment

In deciding a motion for summary judgment, the district court must determine whether the pleadings, discovery materials, and the summary judgment evidence show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). Once the movant presents a properly supported motion for summary judgment, the burden shifts to the nonmovant to show with significant probative evidence the existence of a genuine issue of material fact. *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000).

While summary judgment rules apply with equal force in a section 2254 proceeding, the rules only apply to the extent that they do not conflict with the federal rules governing habeas proceedings. Therefore, section 2254(e)(1), which mandates that a state court's findings are to be presumed correct, overrides the summary judgment rule that all disputed facts must be construed in the light most favorable to the nonmovant. Accordingly, unless a petitioner can rebut the presumption of correctness of a state court's factual findings by clear and convincing evidence, the state court's findings must be accepted as correct by the federal habeas court. *Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002), *overruled on other grounds by Tennard v. Dretke*, 542 U.S. 274 (2004).

## IV.  INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

Claims for ineffective assistance of counsel are governed by the standard announced in *Strickland v. Washington*, 466 U.S. 668 (1984).  To prevail under the *Strickland* standard, a habeas petitioner must demonstrate that his counsel's performance was deficient, and that the deficient performance resulted in prejudice.  *Id.* at 687.  "Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a  breakdown in the adversary process that renders the result unreliable." *Id.*

To satisfy the deficient performance prong, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id*. at 688.  This is a highly deferential inquiry that requires "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. "It is only when the lawyer's errors were so serious that counsel was not functioning as the counsel guaranteed . . . by the Sixth Amendment that *Strickland*'s first prong is satisfied." *Buck v. Davis*, ___U.S. ___, 137 S. Ct. 759, 775 (2017) (citation and internal quotation marks omitted).

To satisfy the prejudice prong, a habeas petitioner must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694.  A habeas petitioner must affirmatively prove prejudice, and cannot rely on mere speculation or conjecture. *See Bradford v. Whitley*, 953 F.2d 1008, 1012 (5th Cir. 1992).  Conclusory allegations are insufficient to demonstrate

either deficient performance or actual prejudice. *See Day v. Quarterman*, 566 F.3d 527, 540–41 (5th Cir. 2009).

Petitioner claims that trial counsel was ineffective in the following particulars:

A.      Motion in Limine

Petitioner contends that trial counsel was ineffective for failing to oppose the State's motion in limine, which sought to restrict the use of complainant's criminal mischief conviction and a protective order between complainant and her mother. According to petitioner, this material was crucial for impeachment and exculpatory reasons and could have reduced his punishment. Petitioner contends that, but for counsel's failure to oppose the motion in limine, he could have received a lower sentence.

As correctly argued by respondent, a motion in limine does not address the ultimate admissibility of certain evidence; rather, it is a procedural device for limiting a party's use of the evidence prior to an actual ruling on its admissibility. Trial counsel's failure to oppose the State's motion in limine did not result in inadmissibility of complainant's prior conviction and the protective order. To the contrary, the state trial court found the evidence inadmissible under state law. In his affidavit responding to petitioner's ineffective assistance claims on state collateral review, trial counsel testified that he did not seek to introduce evidence of complainant's prior conviction and the protective order because complainant "did not appear for trial and did not testify. Consequently such evidence was not admissible nor relevant as impeachment." (Docket Entry No. 9-28, p. 23.)

15

Petitioner's conclusory claim is unsupported in the record. Petitioner demonstrates neither deficient performance nor actual prejudice under *Strickland*, in that he fails to show that, but for counsel's failure to oppose the motion in limine, there is a reasonable probability that the results of his trial would have been different.

Petitioner fails to show that the state court's determination was contrary to, or involved an unreasonable application of, *Strickland* or was an unreasonable determination of the facts based on the evidence in the record. Respondent is entitled to summary judgment dismissal of this claim.

B.    State's Trial Brief

Petitioner further complains that trial counsel failed to reply to the State's trial brief regarding the admissibility of a prior relationship between petitioner and complainant. According to petitioner, had counsel replied to the briefing, the results of his trial could have been different.

In responding to petitioner's claim on state collateral review, trial counsel testified in his affidavit that, "Trial briefs to a court are not evidence in a criminal trial and do not require a response. The best evidence of the relationship between Petitioner and the victim was the testimony of both Petitioner and the victim. Both Petitioner and victim were voluntarily absent during the trial." (Docket Entry No. 9-28, pp. 24–25.) In rejecting petitioner's claim, the state trial court found that petitioner failed to establish that trial counsel was deficient or that any deficiency of counsel affected the outcome of the his case.

16

Petitioner's conclusory claim is unsupported in the record.  Petitioner demonstrates neither deficient performance nor actual prejudice under *Strickland*, in that he fails to show that, but for counsel's failure to reply to the State's trial brief, there is a reasonable probability that the results of his trial would have been different.

Petitioner fails to show that the state court's determination was contrary to, or involved an unreasonable application of, *Strickland* or was an unreasonable determination of the facts based on the evidence in the record.  Respondent is entitled to summary judgment dismissal of this claim.

C.    Mitigation Evidence

Petitioner next argues that trial counsel "failed to investigate, discover, present, and explain mitigating evidence, including the witness['s] criminal history at the punishment phase of his trial."

In responding to petitioner's claim on state collateral review, trial counsel testified in his affidavit to investigating the evidence:

> Prior to trial, the State, through the Montgomery County District Attorney's office Portal, disclosed all the evidence intended to be used in prosecuting Petitioner.  On September 20, 2020, the State provided to Defense Counsel its response to the Standard Discovery Order previously entered by the Court.  At counsel's request, an investigator was appointed on April 16, 2018 to assist the defense in preparing for trial.
>
> Having concern for Petitioner's mental health, Counsel also filed a motion for appointment of a mental health expert on April 17, 2018 which was granted by the Court. The expert report was provided to counsel, the State and the Court.

(Docket Entry No. 9-28, p. 25.)  The state trial court on collateral review found that trial counsel solicited and utilized the findings of a court-appointed investigator and court-appointed mental health expert.  It further determined that petitioner failed to establish that trial counsel was deficient or that any deficiency of counsel affected the outcome of his case. (Docket Entry No. 9-29, p. 87.)  Moreover, the state trial court found that, as a matter of state law, evidence related to petitioner's prior bad acts was admissible at trial to establish the facts and circumstances surrounding the relationship between petitioner and the complainant. *Id.*

A defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial.  *U.S. v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989).  Petitioner in this instance does not allege with specificity any mitigating evidence trial counsel would have discovered with allegedly proper investigation, or how it would have altered the outcome of trial.  To the contrary, petitioner argues that counsel should have challenged the State's time line of events, "which contained potential mitigating information" such as the complainant's potential role in "harassment of her rival for [petitioner's] affections."  (Docket Entry No. 2, p. 21.)  This latter contention is rebutted by the state court record, as evidence of petitioner's sexual relationship with the third party was introduced at trial.  (Docket Entry No. 9-7, pp. 140, 155–157, 184.)

18

Petitioner's conclusory claim is unsupported in the record.  Petitioner demonstrates neither deficient performance nor actual prejudice under *Strickland*, in that he fails to show that, but for counsel's failure to procure and introduce any specific mitigation evidence, there is a reasonable probability that the results of his trial would have been different.

Petitioner fails to show that the state court's determination was contrary to, or involved an unreasonable application of, *Strickland* or was an unreasonable determination of the facts based on the evidence in the record.  Respondent is entitled to summary judgment dismissal of this claim.

D.    Expert Witness

Petitioner further claims that trial counsel was ineffective in failing to present an expert witness to rebut the State's domestic violence expert.  Specifically, he complains that counsel should have requested funds for an expert to refute the State's expert witness testimony that "petitioner would never change" as to domestic violence because the witness relied on "two [out-of-date] scale models."[1]

In responding to this claim on state collateral review, counsel testified in his affidavit that he did not consider hiring an expert to address the testimony of the State's domestic violence expert.  In explaining his decisions, counsel stated that:

---

[1]Petitioner misstates the record.  The State's expert witness testimony addressed domestic violence studies, stalking, and characteristics of the abuser–victim relationship.  She presented no expert witness testimony as to petitioner and did not testify that petitioner would "never change." (Docket Entry No. 9-6, p. 106–131.)  Further, petitioner presents no probative evidence that the witness relied on out-of-date scale models.

The issue in a stalking case is the victim's fear of bodily injury or death resulting from stalking events. Consequently, the perception or fear of bodily injury or death in the mind of the victim is of primary importance in a stalking case and must be proved beyond a reasonable doubt.

\* \* \* \*

No evidence was revealed during the investigation of, nor preparation of, the case for trial, nor witness testimony that the victim possessed the requisite mental fear of death nor serious bodily injury required under a felony stalking statute charge.

(Docket Entry No. 9-28, pp. 25–26.)

The state trial court rejected petitioner's claim and found that petitioner failed "to allege which expert witness was available for trial or support his contention that this expert testimony would have benefitted his case," and failed "to establish that his trial counsel was deficient or that any deficiency of counsel affected the outcome of [petitioner's] case." (Docket Entry No. 9-29, p. 87.)

Petitioner has not identified an expert witness that trial counsel should have called, nor has he shown what the proposed witness's potential testimony would have been. Speculation as to the substance of an uncalled witness's testimony is insufficient to raise a genuine issue precluding summary judgment or to meet the AEDPA burden of proof on federal habeas. *See Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985); *Gregory v. Thaler*, 601 F.3d 347, 352–53 (5th Cir. 2010) (holding that conclusory allegations regarding content of uncalled witness testimony are insufficient to demonstrate ineffective assistance).

Petitioner's conclusory claim is unsupported in the record. Petitioner demonstrates

neither deficient performance nor actual prejudice under *Strickland*, in that he fails to show

that, but for counsel's failure to present an expert rebuttal witness, there is a reasonable

probability that the results of his trial would have been different.

Petitioner fails to show that the state court's determination was contrary to, or

involved an unreasonable application of, *Strickland* or was an unreasonable determination

of the facts based on the evidence in the record. Respondent is entitled to summary judgment

dismissal of this claim.

E.      Stalking Statute

Petitioner contends that trial counsel failed to challenge the constitutionality of section

42.07(a)(4) of the Texas Penal Code, the Stalking Statute, as the statute violated his First and

Fourteenth Amendment rights. According to petitioner, the statute was vague, overbroad, and

unconstitutional.

The intermediate state court of appeals explained the Stalking Statute as follows:

Section 42.072(a)(1) of the Texas Penal Code provides that a person commits
the offense of stalking if, on more than one occasion and pursuant to the same
scheme or course of conduct directed at another person, the person knowingly
engages in conduct that constitutes an offense under section 42.07 of the Penal
Code. Tex. Penal Code Ann. § 42.072(a)(1). Section 42.07(a)(4) of the Texas
Penal Code provides that a person commits the offense of harassment if he
"causes the telephone of another to ring repeatedly or makes repeated
telephone communications anonymously or in a manner reasonably likely to
harass, annoy, alarm, abuse, torment, embarrass, or offend another[.]" Tex.
Penal Code Ann. § 42.07(a)(4). The indictment alleged, *inter alia*, that Hamlin
caused the telephone of N.H. or J.H. "to ring repeatedly" on three occasions,

making N.H. feel harassed, annoyed, alarmed, abused, tormented, embarrassed, or offended and would have caused a reasonable person to feel harassed, annoyed, alarmed, tormented, embarrassed, or offended.

*Hamlin*, 2020 WL 6295085, *4.

In rejecting petitioner's ineffective assistance claim on state collateral review, the trial court found as a matter of law that "Section 42.07(a)(4) of the Texas Penal Code (the "Stalking Statute") is neither vague, nor overbroad." (Docket Entry No. 9-29, p. 89.) Moreover, the Texas Court of Criminal Appeals upheld the constitutionality of the Stalking Statute in *Scott v. State*, 322 S.W.3d 662, 669–70 (Tex. Crim. App. 2010), *abrogated on other grounds by Wilson v. State*, 448 S.W.3d 418 (Tex. Crim. App. 2014). Consequently, petitioner fails to show that the state court would have sustained trial counsel's challenge to the constitutionality of the statute, and counsel was not ineffective in failing to raise a groundless or frivolous objection. *See Green v. Johnson*, 160 F.3d 1029, 1037 (5th Cir. 1998); *McCoy v. Lynaugh*, 874 F.2d 954, 963 (5th Cir. 1989).

For purposes of addressing petitioner's *Strickland* claim in this federal proceeding, the Court is bound by the state court's determination as to the constitutionality of the state statute. "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Trevino v. Johnson*, 168 F.3d 173, 184 (5th Cir. 1999) (quotation marks omitted); *accord Dickerson v. Guste*, 932 F.2d 1142, 1145 (5th Cir. 1991) ("We will not review a state court's interpretation of its own law in a federal habeas corpus proceeding. We do not sit as a 'super' state supreme court in such a proceeding to

review errors under state law." (cleaned up).   This Court has not been tasked with determining the constitutionality of the statute, but rather, with reviewing the state court's determination that trial counsel was not ineffective in failing to raise such a challenge. Consequently, petitioner demonstrates neither deficient performance nor actual prejudice under *Strickland*, in that he fails to show that, but for counsel's failure to challenge the constitutionality of the Stalking Statute, there is a reasonable probability that the result of his trial would have been different.   Petitioner's conclusory claim is unsupported in the record.

Petitioner fails to show that the state court's determination was contrary to, or involved an unreasonable application of, *Strickland* or was an unreasonable determination of the facts based on the evidence in the record.   Respondent is entitled to summary judgment dismissal of this claim.

## V.   CONFRONTATION RIGHTS

Petitioner claims that he was denied his confrontation rights because complainant did not appear or testify at trial and because "there was no subjective evidence from [complainant]."   In rejecting petitioner's claim on state collateral review, the state trial court determined that "[t]he non-appearance of the victim at trial did not violate [petitioner's] right to confrontation," citing *Crawford v. Washington*, 541 U.S. 36 (2004).  (Docket Entry No. 9-29, p. 88.)

It bears mentioning that petitioner challenged the sufficiency of the evidence on direct appeal, arguing that the State failed to prove all the elements of the stalking statute.

23

Specifically, petitioner argued that the State failed to prove that his repeated telephone calls harassed, annoyed, alarmed, abused, tormented, embarrassed, or offended the complainant. The intermediate state court of appeals disagreed, holding as follows:

> The jury heard evidence that before the phone calls occurred, N.H. had been agitated, edgy, emotional, and fearful, and had hidden in a cupboard because she believed Hamlin had broken into the house. The jury also heard evidence that before the phone calls, N.H. had spoken to a women's shelter and had jumped from Hamlin's car and arrived home frightened, crying, and "banged up." In addition, the jury heard evidence that Hamlin called the residence for several days, leading J.H. to turn off the answering machine and the ringers on the phones, and eventually take the phone off the hook. The jury heard J.H. testify that N.H. appeared to be frightened and tormented when Hamlin was calling. J.H. testified that N.H. appeared to be harassed, annoyed, tormented, and alarmed by the calls, and she explained that Hamlin threatened to burn down her home. In addition, the jury heard the voicemails Hamlin left on the phone and heard that Hamlin called N.H.'s phone 196 times on January 22, 2018, 145 times on January 24, 2018, and 235 times on January 25, 2018.

*Id.* In affirming petitioner's conviction, the intermediate court of appeals held that "a reasonable factfinder could have found the essential elements of the offense beyond a reasonable doubt." *Id.*

As the Supreme Court made clear in *Crawford*,

> Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law—as does *Roberts*, and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether. Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination.

541 U.S. at 68.

24

Absent from petitioner's argument or the state court record is any use of the complainant's prior statements as to the telephone calls, such that the right of confrontation became relevant under *Crawford*. The State's witnesses testified to petitioner's own actions and statements and to the complainant's appearance and behavior. Petitioner was fully able to confront and cross-examine the State's witnesses at trial as to events they personally saw or otherwise experienced. The State did not introduce out-of-court testimonial statements made by the complainant as to elements of the stalking charges, and petitioner's right of confrontation was not impinged under *Crawford*.

Petitioner fails to show that the state court's determination was contrary to, or involved an unreasonable application of, federal law or was an unreasonable determination of the facts based on the evidence in the record. Respondent is entitled to summary judgment dismissal of this claim.

## VI.  CONCLUSION

For the above reasons, the Court **GRANTS** respondent's motion for summary judgment (Docket Entry No. 8) and **DISMISSES** this lawsuit with prejudice. Any and all pending motions are **DENIED**. A certificate of appealability is **DENIED**.

Signed at Houston, Texas, on this the /2 day of December, 2022.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

25